Judgment rendered December 17, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,624-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

MARTIN DWAYNE BAILEY, JR.            Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 399,888

Honorable Donald E. Hathaway, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Holli Herrle-Castillo

JAMES E. STEWART, SR.                        Counsel for Appellee
District Attorney

MARGARET E. RICHIE GASKINS
STEPHEN FOLK-CRUTHIRDS
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and MARCOTTE, JJ.

**MARCOTTE, J.**

This criminal appeal arises from the First Judicial District Court, Parish of Caddo, the Honorable Donald E. Hathaway, Jr. presiding. Defendant Martin Dwayne Bailey, Jr. ("Bailey") appeals his conviction for stalking a person in violation of a civil protective order and sentence of 18 months at hard labor. For the following reasons, we affirm defendant's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

Bailey was charged by amended bill of information with stalking a person in violation of a civil protective order, under La. R.S. 14:40.2(B)(3). The victim was Tanya Jones ("Jones"), and the offense occurred on or about January 17, 2024. Bailey pled not guilty. A trial was held January 13 and 14, 2025, where the following evidence was adduced.

Jones testified that she had been married to Bailey for 13 years and they had a daughter together. Jones and Bailey separated, and, through their divorce proceedings, the court issued a civil protective order. The order, signed by the court on November 15, 2023, prohibited the parties from "physically abusing, sexually harassing, stalking, and/or threatening each other in any manner whatsoever." The prohibition included the "use, attempted use, or threatened use of force, physical violence that would reasonably be expected to cause bodily injury, and from contacting the other party, personally, electronically, by phone, texting, in writing, through social media, or through a third party, or to go to either [the] residence or place of employment of the other." Bailey and Jones were ordered to enroll in and

use Our Family Wizard ("OFW") to communicate with each other about their child.

Jones testified that after the civil protective order was issued, Bailey texted her every day, 20 to 70 times a day. Some of the text messages were about their daughter, but many were not. Several of the messages were threatening. She said he texted her from different phone numbers and not through OFW. Jones said that she had custody of their daughter at the time, and Baily had supervised visitation with her for two hours per week. The visits were supposed to be supervised by Jones' mother, sister, or father, and Bailey was expected to schedule the visits through OFW.

Jones stated that on January 16, 2024, Bailey continued to send her text messages throughout the day. Jones had moved to a new home in a trailer park on Dixie Blanchard Road, and Bailey told her that he was going to come to her home and see their daughter. Jones told him he was not allowed to do that. Bailey continued to send her text messages throughout that day and the next day. Jones said the messages were very threatening and harassing toward her and Dylan Richmond ("Dylan"), the person Bailey believed to be Jones' boyfriend. Jones said that Dylan was the person who was performing work on her home. The text messages were admitted. Jones read the following text message exchange:[1]

| Jones: | You are not allowed at my house. |
| Bailey: | Watch me I will be there |
| Bailey: | As long as you are the mother of my child you will not refuse me |
| Bailey: | I will show up with the law if I have to I will be at your house |

---

[1] All text messages are reproduced verbatim, including the censored words.

Bailey: I will see my daughter with the police

Jones said that, at that time, Bailey had not scheduled visitation with his daughter. Jones read following texts:

Bailey: I'm not trying to fight with you

Bailey: I'm tired of these games

Bailey: I'm tired of these games you do not control me

Bailey: I pity that little fool that he's f****** with fat w**** anyway

Jones: I will meet with you but this is my home and you are not allowed

Bailey: Yes I will bet you bet I don't knock on your mother f***** door

Bailey: I was going to wait till morning because it was going to be too late but now I am not waiting

Bailey: You will not refuse me the rights to see my daughter Where She lays nor the house that you have her in I will get to see both

Jones: No you don't

Bailey: So tell your little boyfriend he might not want to be there cuz if he's there I swear to God that I will drag him out and beat the f*** out

Jones: I don't have a boyfriend

Bailey: I have a right to know if she's safe and I do not know if she's safe or the place that's around or who's there with her so yes I do and the police will back it they will go in and check for me cuz if he's there it's

Bailey: You been hiding him the whole time don't lie

Jones testified that in Bailey's repeated references to her "boyfriend," he meant Dylan. Jones said at that time, their daughter was with her and completely safe. She read more text messages:

3

Bailey: That's one of your mini lies you're been telling me over and over

Jones: Call the police to come with you because your not welcome…

Bailey: Enough about this I'm done talking I told you I'll be there. End of discussion

Bailey: Don't worry they [the police] will be with me

Bailey: Just as in I will remove her from that home if I choose

Jones: No you won't LOL

Bailey: Might not be tonight might not be tomorrow but one day you will not keep my daughter for me like you're

Bailey: You will not keep my daughter for me like you're doing

Bailey: Over My Dead Body

Jones: I'm not keeping her from you. Your acting crazy…

Bailey: You just don't want me to see his stuff there at your house

Bailey: Because you're telling me I'm not welcome where my daughter is that's what got me crazy this time and you know it you know by refusing me the right to see where my daughter lays you would be pissing … me off

Jones said that Bailey was texting her "minute by minute," and "It just didn't stop." She testified that Bailey went from fighting about Dylan to asking about their daughter. She read the following messages:

Bailey: Stop trying to make me mad clear your boyfriend stuff up so I don't see it and welcome me in to see the house and then what she's done and what you've done and that she's safe and then I can ease my way back out
….

4

Bailey:    Make sure your cameras on I want to I want them to see me drag that little m*********** out

Bailey:    You do have your cameras up and running right

Jones affirmed that Dylan had not threatened Bailey and that there was not anything going on between the two men.  She read on:

Bailey:    I hope you do because then that's really not safe

Bailey:    Maybe if you stop trying to control me and then acting like you're hiding something I wouldn't care
....

Bailey:    Using our daughter to control me in my actions is really childish

Bailey:    Your boyfriend must be whispering in your ear that

Bailey:    You know the good thing is is that road is Public Road so I could drive right in front of your house an stop and you would have to bring the child out to me and that's it right there I don't have to go in your house I know that's what you're trying to hide but you can't stop me from driving by your

Bailey:    And if I'm not welcome at your house then she's not welcome at your house neither is he

Bailey:    That's going to go over real good with court I'm not allowed at my daughter's house because … her mom's boyfriend

Jones:     Your insane

Bailey:    No I'm not I'm just telling you the law I do have the right to know my daughter safe just saying I'm supposed to believe you okay but you also can't stop me from doing anything you have no pool I'm not on your property it's not even your property you rent it you rent the the land the lease on the land

Bailey:    But I'm not even trying to start trouble I'm just trying to see my kid you're the one hiding something

5

Bailey:     That's all right I'll see his car one day parked in front of your house and I'll know

Bailey:      It might not be today might not be tomorrow might be a year from now but mark my words he's got it coming

Jones:      Get a life Martin I will not do this with you

Bailey:     You're not alone it took two to make her too stop being a single mom you can be a single mom or you're no single I mean you could be a co-parent that's what you … are

Bailey:     Start acting like it

Bailey:     Decisions and co-parents are made together not

Bailey:     Outside my piece I'm done

Bailey:     Not outside I said … my piece and I'm done

Bailey:     You know I could have literally go all week and not be made at your and your instantly find a way to piss me off

Bailey:     I'll be he's there right now saying oh he can't do nothing … f*** him

Bailey:     And you're just as much of a coward as he is hide behind that

Bailey:     Not letting the Man fight his battles that he started

Bailey       There you go let [our daughter] and see her dad get hauled off to jail because the f****** mom tried to do it again and lied to the police

Bailey:     Talk text not [our daughter]

Jones:      I never lied and you know it

Bailey:     Yes you did said I choke you that's what the cop said the cop said I beat you up and choke you

Bailey:     And you know I did not

Jones:      Yes you did

Bailey:     I have never put my hands on

6

Bailey: You're a damn liar

Jones: You lie like the dog you are

Bailey: See that's what you say when someone lies but when that your boyfriend was telling me that he f***** you and that that you were his girl you didn't say you're a damn

Jones affirmed that Bailey and Dylan did not talk or have a relationship. She continued to read Bailey's text messages to her:

Bailey: You were his girl you didn't say you're a damn liar to him

Bailey: Because he wasn't lying he was telling me the truth of what you told him

Bailey: So I really hope he's there

Bailey: I pray that I see him

Bailey: Lord give me the strength give me the strength to keep my cool and deal with this lying piece of trash and whoop her

Bailey: And whoop her boyfriend's ass

Bailey: Amen…

Bailey: Would you like to know the difference of me from right now than 16 years ago when you went over your brother's house and beat up on that girl you want another differences

Jones: If you put one hand on me you will be going to jail Martin I promise you that

Jones said that she was very scared due to Bailey's text messages. She said they kept "going back and forth, and it just wouldn't stop." She read:

Bailey: I've been married to you for 16 years and watch you lie to me for 16 years there's a difference

Bailey: I'm not talking about you

Bailey: Unless you step in between him and me

7

Bailey:    If you step between him and me I promise you I
           will treat you like him

Bailey:    And why would I put a hand on you

Bailey:    Did you not read the messages

Jones:     Because you said it

Bailey:    Never once have I actually said I was going to hit
           you or beat your ass now I'll have some girl do
           that I don't need to

Jones testified that she took that to mean Bailey would have a third

person beat her up.  She continued to read the following text messages:

Bailey:    No I'm talk texting and I'm not reading the
           messages I'm sorry if I said that I was talking
           about your boyfriend not you

Jones:     I don't have a boyfriend

Bailey:    Dylan I'm talking about dealing if he's there or it's
           staying there or moves in I'm f****** him up then
           you will be dealt with right then

Bailey:    I do when it's him and I promise you I will drag
           his dead corpse right out of your house

Bailey:    He better not be there

Bailey:    Is the cops are going to have to shoot me to get me
           off of don't worry I'm bringing them with me

Jones:     OK

Bailey:    You really testing the wrong Waters with me
           woman I told you he's better not be around my
           child

Bailey:    And if he's around my child all hell's broke loose

Bailey:    Is he there or not

Bailey:    That's what I though you're f****** coward too

The text messages that were read in court started around 6:50 p.m. and

ended around 7:15 p.m. on January 16, 2023.  A photograph that Jones took

8

was admitted. She testified that it depicted an Apple AirTag tracking device that was on her car. Jones called the police about the device. She said she found it on or around November 26, 2023; it was attached to the frame of her car. Jones said that Bailey was constantly messaging and badgering her and that he would not leave her alone.

Jones testified that around 4:00 a.m. on January 17, 2023, she saw Bailey's 18-wheeler parked on the road to her house, located at 8059 Dixie Blanchard Road. She testified that the road to her home terminated at her home, and that there was no outlet. She said Bailey was there with a girl. Jones said that there was no reason for anyone to be in her private drive at 4:00 a.m. She called the police. She showed the police the text messages, and they saw Bailey. They issued him a summons and told him to stay away from her home.

Jones stated that she did not receive any text messages from Bailey while he was parked in her drive. She said she moved to her new home a few weeks before the incident. She affirmed that her address at the time the protective order was issued was 8310 Dixie Blanchard Road, the home she shared with Bailey. She said that Bailey moved out of that home when they separated.

Deputy Aaron Normand ("Dep. Normand"), who was employed by the Caddo Parish Sheriff's Office, testified that he was called to Jones' residence on January 17, 2023. He said that the roads were covered in snow and ice, and he arrived there around 6:00 a.m. He noticed Bailey's 18-wheeler parked 3-4 houses down (approximately 100 yards) from Jones' residence. Dep. Normand spoke first with Bailey, who said he had pulled into an empty lot and got stuck due to the bad roads. When the deputy

9

arrived, Bailey was attempting to drive his 18-wheeler back and forth to get it out of the frozen mud in which it was stuck.

Dep. Normand spoke with Jones, who explained her relationship with Bailey and showed the deputy his text messages to her from the previous 24 hours. Dep. Normand said that the road Jones lived on was very narrow, with little room for two cars to pass each other. Dep. Normand spoke with Bailey again and then issued him a summons for stalking. Dep. Normand stayed until Bailey's vehicle was removed, around 10:00 a.m., to ensure there was no contact between the two. Dep. Normand affirmed that there was a female passenger in Bailey's 18-wheeler. The state rested.

Breanne Sullivan ("Sullivan") testified for the defense. She described herself as Bailey's best friend and said that he was a hard worker who wanted to see his child, and she had never known him to threaten anyone.

Leroy Dean Mize ("Mize"), Bailey's brother, testified that he asked Bailey to pick up his niece from the same trailer park where Jones lived. Bailey contacted Mize to help pull his rig out from where it was stuck. Mize said that, while he was at the trailer park, he did not see anyone in his group approach or speak with Jones. Mize said he knew Jones throughout her marriage to Bailey, and he had never known Bailey to threaten Jones. Mize testified that Jones was angry with Bailey and that he thought the couple had "issues." Mize said he did not know that Jones lived in the trailer park and was unaware of their ongoing divorce proceedings.

Bailey elected not to testify in his own defense, and the defense rested. The six-member jury returned a verdict of guilty as charged. The jury was polled, and the verdict was unanimous.

Bailey filed a motion for a new trial and a motion for a post-verdict judgment of acquittal. The motions were denied; the defense objected. On February 3, 2025, Bailey came before the court for sentencing. The trial court said that Bailey was born in 1979, and he affirmed that he had some college education and was employed as a truck driver. The court noted that he had been married to Jones for more than 10 years and they had one daughter together. The court said Bailey had felony drug offenses from 2006 and 2014. The court considered the factors found in La. C. Cr. P. art. 894.1 and sentenced Bailey to 18 months at hard labor with credit for time served. The court waived a fine or costs and informed Bailey of his appellate and post-conviction relief time delays. The court issued a permanent protective order in favor of Jones. The court said any matters regarding custody or visitation were to be handled through family court. Bailey now appeals.

**DISCUSSION**

In Bailey's single assignment of error, he contends that there was insufficient evidence upon which to base his conviction. He claims that stalking requires the specific intent to inflict a continuity of emotional distress upon the victim by a series of acts. He argues that his goal in texting Jones was to ensure that their child was safe and not to scare his wife. He contends that the purpose of his threats to Dylan was also not to alarm his estranged spouse but to prevent Dylan from seeing his child. He states that the only evidence presented was the text messages between himself and Jones that were exchanged 12 to 24 hours prior to her calling law enforcement.

He argues that the state provided no link between him and the Apple AirTag found on Jones' car. He also states that Jones testified that he contacted her multiple times a day prior to the date of the offense, but those texts were not admitted. Bailey points out that in his text exchange with Jones he said that he had never harmed her and would never do so but that he would have a girl do that. He also said in his texts that he was using the talk to text feature on his phone and not reading the messages before sending them.

Bailey also argues that the state failed to present sufficient evidence that his text messages caused Jones to feel alarm or emotional distress. He points out that Jones responded to his texts, and her responses were not indicative of a person who was alarmed or distressed. Bailey says that Jones texting "LOL" and "Get a Life," shows that she was not alarmed by his texts.

He argues that if Jones felt alarm or emotional distress, it was only when she saw him in his truck on her street. Bailey contends that he had to know where she lived for his presence there to be intentional harassment, and he had to know that Jones would look out her window at 4:00 a.m. when he drove on her street. He argues that there was no evidence presented that showed he was aware of Jones' new address. He contends that he was in the area to pick up his niece on behalf of his brother. He argues that driving by Jones' house a single time does not constitute stalking because that crime requires recurring or renewed behavior. He asks that his conviction and sentence be vacated.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to

12

the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Cartwright*, 52,056 (La. App. 2 Cir. 8/15/18) 252 So. 3d 1045, *writ denied*, 18-1531 (La. 4/22/19), 268 So. 3d 302. This standard, legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Cartwright*, *supra*.

The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Eason*, 43,788 (La. App. 2 Cir. 2/25/09), 3 So. 3d 685, *writ denied*, 09-0725 (La. 12/11/09), 23 So. 3d 913, *cert. denied*, 561 U.S. 1013, 130 S. Ct. 3472, 177 L. Ed. 2d 1068 (2010).

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is so viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Cartwright*, *supra*.

13

Louisiana Revised Statute 14:40.2 provides:

(A) Stalking is the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include but not be limited to the intentional and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or behaviorally implied threats of death, bodily injury, sexual assault, kidnapping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted.
….

(B)(3) (3) Any person who commits the offense of stalking against a person for whose benefit a protective order, a temporary restraining order, or any lawful order prohibiting contact with the victim issued by a judge or magistrate is in effect in either a civil or criminal proceeding, protecting the victim of the stalking from acts by the offender which otherwise constitute the crime of stalking, shall be punished by imprisonment with or without hard labor for not less than ninety days and not more than two years or fined not more than five thousand dollars, or both.
….

(C)(1) "Harassing" means the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures.

(2) "Pattern of conduct" means a series of acts over a period of time, however short, evidencing an intent to inflict a continuity of emotional distress upon the person. Constitutionally protected activity is not included within the meaning of pattern of conduct.

Stalking is a general intent crime that requires only that defendant have the general intent to repeatedly follow or harass the victim in a manner that would cause a reasonable person to feel alarmed or to suffer emotional distress. *See State v. Terrio*, 19-90 (La. App. 5 Cir. 3/20/19), 2019 WL 1285288, *writ denied*, 19-0491 (La. 4/10/19), 267 So. 3d 617. Here, the state had to prove that Bailey repeatedly and intentionally followed or

harassed Jones in a manner that would cause a reasonable person to feel alarmed or to suffer emotional distress. To obtain the sentencing enhancement provided in La. R.S. 14:40.2(B)(3), the state was also required to prove that Jones had a protective order guarding her from acts by Bailey which would otherwise comprise the crime of stalking.

The state proved that there was a civil protective order issued as a part of Jones and Bailey's divorce proceedings. That order prohibited defendant and Jones from "physically abusing, sexually abusing, harassing, stalking, and/or threatening each other in any manner." The protective order also prohibited the two from contacting each other "personally, electronically, by phone, texting, in writing, through social media, or through a third party." In addition, they were prohibited from going to each other's residences and places of employment. They were ordered to communicate through OFW to schedule Bailey's supervised visitation with their child. Jones testified that Bailey never used the app or set up visitation.

Rather, Bailey, for a period of approximately two months between November 2023 and January 2024, sent dozens of daily text messages to Jones, many of which were threatening. Bailey's argument that the state did not prove his behavior was repeated is unfounded. Jones testified to the two-month duration of the text messages, and the jury was tasked with determining her credibility as a witness. Furthermore, La. R.S. 14:40.2(C)(2) provides that the pattern of conduct constituting stalking means a series of acts over a period "*however short,* evidencing an intent to inflict a continuity of emotional distress upon the person."

That the state introduced screen shots of Bailey's January 16, 2024, texts is sufficient to show that Bailey's behavior was repeated, as was her testimony about other text messages defendant sent to her. The number and nature of the text messages also support the state's assertion that Bailey's conduct was repeated. The repetitive text messages were harassing within the meaning of that term as defined in La. R.S. 14:40.2. "Harassing means the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures." *Id*.

On January 16, 2024, Bailey sent 95 text messages to Jones within a 26-minute span. Jones responded 18 times, using terse language, demonstrating that she did not want to communicate with defendant or have him come to her home. Jones' responses to Bailey's multiple messages did not invite Bailey's contact as he suggests.

Bailey claims the state failed to prove that he had the requisite specific intent to inflict a continuity of emotional distress upon Jones. We disagree. In the unpublished opinion *State v. Terrio*, *supra*, the court of appeal considered whether the 2001 legislative changes to La. R.S. 14:40.2 removed the specific intent requirement from the offense of stalking. The court said, after reviewing the legislative history of the revisions to the stalking law, that the legislative purpose of the proposed changes was to shift the focus from the offender's intentions to the perceptions of the victim. *Id*. The court pointed out that the legislature said that it redefined the crime of stalking to require only that the defendant have the general intent to repeatedly follow or harass the victim in a manner that would cause a

16

reasonable person to feel alarmed or to suffer emotional distress. *Id.* We note also that the Louisiana Supreme Court denied Terrio's writ application following the court of appeal's ruling. *Id.*

Jones testified that she found Bailey's text messages menacing and she feared for her safety. Bailey repeatedly threatened to forcibly enter her home and to have a third person attack Jones. Bailey knew that the civil protective order stated that he could not enter Jones' home or contact her. Jones saw Bailey on her street in the early morning hours less than one day after receiving the extensive string of texts from Bailey that made her feel threatened and suffer emotional distress.

We also agree with the state that the circumstantial evidence was sufficient to prove that Bailey knew where Jones resided and went to her street on January 17, 2024, for the purpose of harassing her. On November 26, 2023, Jones found an AirTag attached to her car. The civil protection order was issued 10 days earlier on November 16, 2023. Bailey said in one of his messages to Jones that he could drive by or stop in front of her house since she lived on a public road. The jury could have inferred from the circumstantial evidence that Bailey knew Jones' address.

We find the evidence sufficient to show that any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. Defendant committed stalking against Jones by intentionally and repeatedly harassing her in such a way that would cause a reasonable person to feel alarmed or to suffer emotional distress; he also violated the November 16, 2023, civil protective order.

## CONCLUSION

For the foregoing reasons, the conviction and sentence of Martin Dwayne Bailey, Jr. are affirmed.

**AFFIRMED.**